APPEAL NO. 23-15279
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

**NICHOLAS YAROFALCHUW**,

Plaintiff-Appellant,

vs.

**JOHN CABRERA and DANNY FITIAL,**

Defendants-Appellees.

_____

Appeal from the District Court for the Northern Mariana Islands
District Court No. 1:22-cv-00001
_____

**APPELLANT'S REPLY BRIEF**
_____

JOSEPH E. HOREY
BANES HOREY BERMAN & MILLER, LLC
4165 Beach Road, Garapan, Saipan
Commonwealth of the Northern Mariana Islands
PO Box 501969, Saipan MP 96950
Telephone: (670) 234-5684
Fax No. (670) 234-5683

# TABLE OF CONTENTS

INTRODUCTION     1

I. FACTUAL ISSUES     2

    A. The Facts Must Be Viewed in the Light
Most Favorable to Appellant     2

    B. "Blocking the Driveway" and "Outside the Bushes"
Are Not True Factual Issues     5

II. THE SEIZURE BY SHOW OF AUTHORITY     7

    A. Mr. Yarofalchuw Was Seized by Show of Authority
While He Was in the Curtilage of His Home     7

    B. Cabrera Was an Integral Participant in the
Seizure by Show of Authority     9

    C. Fitial Was an Integral Participant in the
Seizure by Show of Authority     11

    D. A Show of Authority is an Objective Fact, the Existence of
Which Is Not Affected by the Parties' Knowledge or Intent     13

    E. Mr. Yarofalchuw's Mobility Within the Curtilage
Does Not Negate the Show of Authority     15

III. THE SEIZURE BY PHYSICAL FORCE     19

    A. Mr. Yarofalchuw Was Seized by Physical Force
While Both He and Fitial Were in the Curtilage of His Home     19

    B. Santana Does Not Justify a Seizure by an Officer
Who Has Crossed the Threshold     24

IV. THERE WERE NO EXIGENT CIRCUMSTANCES     27

V.    THE DENIAL OF THE MOTION FOR LEAVE TO AMEND
      WAS IN ERROR                                        29

CONCLUSION                                                29

FORM 8                                                    30

# TABLE OF AUTHORITIES

**Cases**

Brendlin v. California, 551 U.S. 249 (2007)     13, 14, 15, 17, 18

Brizuela v. City of Sparks, 2022 WL 3229389 (D. Nev. 2022)     16, 22

Brizuela v. City of Sparks, 2023 WL 5348815 (9th Cir. 2023)     16, 22

Campbell v. Cheatham County Sheriff's Dept., 47 F.4th 468 (6th Cir. 2022)     17, 18

Commonwealth v. Bowie, 3 N.M.I. 462 (1993)     24, 27

Collins v. Virginia, 138 S. Ct. 1663 (2018)     23, 24

Dalcour v. City of Lakewood, 492 Fed. App. 924 (10th Cir. 2012)     21, 23

Easley v. City of Riverside, 765 Fed. App. 282 (9th Cir. 2019)     13

Enying Li v. Holder, 738 F.3d 1160 (9th Cir. 2013)     25

Florida v. Bostick, 501 U.S. 429 (1991)     8, 29

Florida v. Jardines, 569 U.S. 1 (2013)     20, 22, 23, 26, 29

Glazer v. City of Long Beach, 210 F. Supp. 2d 1131 (C.D. Cal. 2000)     27

Good v. Dauphin County Social Services for Children & Youth, 891 F.2d 1087 (3rd Cir. 1989)     28

Hanie v. City of Woodstock, 2008 WL 476123 (N.D. Ga. 2008)     21

Hopkins v. Bonvicino, 573 F.3d 752 (9th Cir. 2009)     8, 17, 28, 29

Katz v. United States, 389 U.S. 347 (1967)     25, 26

Key v. State, 348 So.3d 691 (Fla. App. 2022)     23

iii

Kyllo v. United States, 533 U.S. 27 (2001)                          20, 21, 22,
                                                                    23, 29

LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000)        25, 26, 27,
                                                                    28

Lawson v. Gregg, 2014 WL 12519805 (D. Alaska 2014)                 22

Malek v. Green, 2018 WL 2431437 (N.D. Cal. 2018)                   27

Madruga v. County of Riverside, 431 F.Supp.2d 1049 (C.D. Cal. 2005)  19

Mapp v. Ohio, 367 U.S. 643 (1961)                                  18

McClatchy Newspapers v. Central Valley Typographical Union,
686 F.2d 731 (9th Cir. 1982)                                       1

Mincey v. Arizona, 437 U.S. 385 (1978)                            28

Oliver v. United States, 466 U.S. 170 (1984)                      20, 23

Parish v. Lansdale, 2019 WL 4849612 (D. Ariz. 2019)               21

Payton v. New York, 445 U.S. 573 (1980)                           20, 21, 22

Peck v. Montoya, 51 F.4th 877 (9th Cir. 2022)                     9, 13

Quintero v. City of Escondido, 2017 WL 4005345 (S.D. Cal. 2017)   27

Ana Sandoval v. County of San Diego, 985 F.3d 657 (9th Cir. 2021)  2, 3

Jesus Sandoval v. Las Vegas Metropolitan Police Dept.,
756 F.3d 1154 (9th Cir 2014)                                       2, 3

Key v. State, 348 So.3d 691 (Fla. App. 2022)                      23

Sidhu v. Garcia, 459 Fed. App. 613 (9th Cir. 2011)                28

Sumida v. Yumen, 409 F.2d 654 (9th Cir. 1969)                     2

Terry v. Ohio, 392 U.S. 1 (1968)   7

Tolan v. Cotton, 572 U.S. 650 (2014)   2

United States v. Al-Azzawy, 784 F.2d 890 (9th Cir. 1985)   8

United States v. Berrong, 712 F.2d 1370 (11th Cir. 1983)   22

United States v. Botero, 589 F.2d 430 (9th Cir. 1978)   24, 27

United States v. Brown, 996 F.3d 998 (9th Cir. 2021)   8

United States v. Charles, 290 F.Supp.2d 610 (D.V.I. 1999)   22

United States v. Files, 63 F.4th 920 (11th Cir. 2023)   24

United States v. Raymond Johnson, 626 F.2d 753 (9th Cir. 1980)   8, 29

United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000)   24

United States v. Santana, 427 U.S. 38 (1976)   24, 25, 26, 27

United States v. Vaneaton, 49 F.3d 1423 (9th Cir. 1995)   24, 27

United States v. Williams, 581 F.2d 451 (5th Cir. 1978)   22

Ward v. San Diego County, 791 F.2d 1329 (9th Cir. 1986)   12

Wiederspohn v. Freeman, 2009 WL 10723396 (W.D.Wash. 2009)   20

**Other**

Fed. R. Civ. P. 60(a)   2

Sundby, The Rugged Individual's Guide to the Fourth Amendment, 65 UCLA L. REV. 690 (2018)   18

WIKIPEDIA, "Touchdown," https://en.wikipedia.org/wiki/Touchdown   21

# **INTRODUCTION**

When Appellant filed his Opening Brief, the district court had not issued a written decision on the cross-motions for summary judgment below.  Instead, it had ruled from the bench,[1] and had entered judgment based on that bench ruling.  *See* FER-3.  Appellant therefore based the arguments in his Brief on the district court's reasoning as stated from the bench, at ER-15-57.  Only now has the district court issued a written opinion "set[ting] forth the Court's reasoning," SER-4, on those motions.  *See* SER-3 *ff.*[2]  This belated opinion has thus become, in effect, a third Appellee's Brief, and Appellant will reply to its reasoning as necessary herein.

In fact, however, the district court acted without jurisdiction in issuing this opinion. "When a judgment is appealed, jurisdiction over the case passes to the appellate court." McClatchy Newspapers v. Central Valley Typographical Union, 686 F.2d 731, 734 (9th Cir. 1982).  "A properly filed notice of appeal vests jurisdiction of the matter in the court of appeal; the district court thereafter ha[s] no

---

[1]    *See* ER-49 ("So in summary, I am denying Plaintiff's motion for summary judgment against both Mr. – or Sergeant Cabrera and Officer Fitial, and granting summary judgment on behalf of the Sergeant Cabrera and Officer Fitial for their qualified immunity defense.").

[2]    Appellees have submitted separate Supplemental Excerpts of Record, but the district court's opinion appears in both, and at the same pages of each.  Citations to that opinion herein will therefore refer to pages in the "SER" generally, without distinguishing between the Appellees' submissions.

power to modify its judgment in the case or proceed further except by leave of the appellate court." Sumida v. Yumen, 409 F.2d 654, 656–57 (9th Cir. 1969). "[A]fter an appeal has been docketed in the appellate court and while it is pending," even a clerical error "may be corrected only with the appellate court's leave." Fed. R. Civ. P. 60(a). The district court's opinion does a good deal more than correct clerical errors,[3] but the district court did not have leave of this Court to do so. Its opinion was therefore *ultra vires*; it should be vacated and disregarded.

## I. FACTUAL ISSUES

### A. The Facts Must Be Viewed in the Light Most Favorable to Appellant.

Appellees consistently flout the rule that the Court must view the facts in the light most favorable to Mr. Yarofalchuw.[4] They recognize that this is the rule,[5] but

---

[3]     For example, it specifically finds that no constitutional violation occurred, *see, e.g.*, SER-13 ("there was not an unlawful seizure"), a point on which the court had been equivocal from the bench, relying instead on the ground that any violation was not "clearly established." *See* ER-22, ER-31.

[4]     *See, e.g.*, Ana Sandoval v. County of San Diego, 985 F.3d 657, 671 (9th Cir. 2021) ("In determining whether a state official is entitled to qualified immunity in the context of summary judgment, [the Court] consider[s] whether the evidence *viewed in the light most favorable to the plaintiff* is sufficient to show a violation of a constitutional right[.]") (emphasis added, internal quotation marks omitted); Tolan v. Cotton, 572 U.S. 650, 655-56 (2014) ("In resolving questions of qualified immunity at summary judgment, courts . . . first ask[] whether the facts, *taken in the light most favorable to the party asserting the injury*, show the officer's conduct violated a federal right.") (emphasis added, internal punctuation omitted).

[5]     *See* Cabrera's Brief at 12 (*citing* Jesus Sandoval v. Las Vegas Metropolitan Police Dept., 756 F.3d 1154, 1160 (9th Cir 2014), for the same point); Fitial's Brief

they ignore it, consistently portraying the facts in the light most *unfavorable* to Mr. Yarofalchuw, with the overall tendency of making him appear violent and dangerous.

For example, Sgt. Cabrera states, as a fact, that Mr. Yarofalchuw "threatened [another man] with gun violence," Cabrera's Brief at 6,[6] when Mr. Yarofalchuw himself expressly denied doing so. *See* ER-149 ("I never threatened to shoot the man at Tank Beach[.]"). Appellees likewise repeatedly describe Mr. Yarofalchuw as "belligerent,"[7] "aggressive[],"[8] "scream[ing] obscenities,[9] "slamm[ing] down his

---

at 9 (court "must view the evidence in the light most favorable to the nonmoving party").

Note: Cabrera miscites the volume number of <u>Jesus Sandoval</u> as 765; it is actually 756. Mr. Yarofalchuw, for his part, miscited the page number of the above passage from <u>Ana Sandoval</u> as 670 in his Opening Brief; it is actually 671.

[6] *See also id*. at 9 ("the DFW employee whom he threatened to shoot"). Fitial likewise claims that Mr. Yarofalchuw had "threatened to shoot . . . any DFW employee." Fitial's Brief at 4. He endorses the truth of this claim by stating that police investigation "revealed" it, rather than that the man on the beach "claimed," or "alleged" it. *See id.* Indeed, a threat to shoot "any DFW employee" goes beyond what the man on the beach himself originally claimed, which was to shoot the employee "that's flying the drone." ER-179.

[7] Cabrera's Brief at 7; Fitial's Brief at 2.

[8] Fitial's Brief at 6 ("aggressively approaching," "aggressively returned").

[9] Cabrera's Brief at 7. *See also* Fitial's Brief at 6 ("screaming profanities"); *id*. at 2 ("screaming profanities and aggressively approaching").

beer,"[10] "rush[ing] inside of his home,"[11] then "rush[ing] toward Sgt. Cabrera"[12] and holding his cell phone "inches away from his face,"[13] all of which Mr. Yarofalchuw disputed. *See* FER-4-8.[14]

Their aim in doing so may be simply to make the opposing party look bad, but it also serves to subtly distort the actual issues, both by implying that "exigent circumstances" existed justifying the seizure of Mr. Yarofalchuw – which they did not (*see infra* Section IV) – and by suggesting that he was never really seized at all until he was handcuffed – which he was (*see infra* Section II(E)). This effort to present the facts in the light *least* favorable to the plaintiff, however, is improper for these or any other purposes, and it too, like the district court's belated opinion, should be disregarded.

---

[10]    Cabrera's Brief at 8. *See also* Fitial's Brief at 6 ("slammed his beer on the table"). Fitial simply lifts this "fact" from Cabrera. Fitial himself was not present when Mr. Yarofalchuw left the pavilion, and has no idea what he did with his beer.

[11]    Cabrera's Brief at 8. *See also* Fitial's Brief at 6 ("rushed into his house").

[12]    Cabrera's Brief at 8. *See also* Fitial's Brief at 6 ("aggressively approaching Sergeant Cabrera").

[13]    Fitial's Brief at 6. *See also* Cabrera's Brief at 9 ("close to the face of Sgt. Cabrera").

[14]    Mr. Yarofalchuw not only disputed holding the phone in Sgt. Cabrera's face, he offered a photographic recreation of the scene (ER-78), which shows him, even with his phone held out at arm's length toward Cabrera, still well away from him. *Cf.* ER-85 (defining "any confrontation closer than arm's length" as "a breach of an officer's danger zone").

### B. "Blocking the Driveway" and "Outside the Bushes" Are Not True Factual Issues.

Two issues appear to be factual disputes, but actually are not – namely, whether the police cars "blocked the driveway" and whether Mr. Yarofalchuw was "outside the bushes" at the head of the driveway when he was handcuffed. As to both issues, the parties are merely using different words to describe the same facts.

In fact, everyone puts the cars in the same positions relative to the driveway. The officers depict their positions in a diagram at ER-167. Mr. Yarofalchuw depicts them in photos at ER-74-75. The only difference between the two is that, in the diagram, the cars are shown parked *in* the roadway, whereas, in the photos, they are shown parked in the grassy area *beside* the roadway – *i.e.*, the cars' position in the photos is about five feet to the left of their position in the diagram. Their positions relative to each other, to the site where Mr. Yarofalchuw was handcuffed, and to the entrance of his driveway are the same in both depictions, although different witnesses described the last of these differently.[15] In both the diagram and the

---

[15] Mr. Yarofalchuw and David describe both cars as blocking the driveway. ER-149 ¶ 4; ER-146-7 ¶ 4. Carlos states that Cabrera's car did not block the driveway, but that Fitial's did. ER-124 ¶¶ 11, 16. Cabrera states that he did not block the driveway, but that Officer Fitial "may have" done so. ER-91 ¶¶ 37, 44. Fitial states that Cabrera's car was not blocking the driveway," ER-85 ¶ 11, but does not mention his own. Sherwin states that Fitial's car was blocking the driveway, ER-144-45 ¶ 4, but does not specify as to Cabrera's.

5

photos, there is not enough room between the cars for another car to pass between, while there is enough room for a man on foot to do so – although he would be unlikely to feel free to do so with a policeman planting himself there. Although they actually show the same thing, the district court, for some reason, viewed them quite differently, concluding from the officers' diagram, ER-167, that "Sgt. Cabrera's police vehicle, with Fitial's vehicle parked to the rear of Sgt. Cabrera's, completely obstructed the entrance of Yarofalchuw's driveway," SER-14-15, and from Mr. Yarofalchuw's photo recreation, ER-75-6, that "Sgt. Cabrera did *not* obstruct the driveway entrance." SER-16. In any event, the issue is a red herring. It is not determinative one way or the other if the driveway was blocked. That is only one factor in the determination of whether a reasonable person would feel free to terminate the encounter with police. This is especially true since Mr. Yarofalchuw was already at home and had no intention, and made no effort, to depart.

The second "factual" dispute is whether Mr. Yarofalchuw was "outside the bushes" when handcuffed. Fitial claims that he was. *See, e.g.*, Fitial's Brief at 16 ("The arrest was not a seizure on Yarofalchuw's property because it occurred outside of his curtilage clearly delineated by the bushes."). Even Cabrera, who usually, and more accurately, places Mr. Yarofalchuw at "the very edge of his property," Cabrera's Brief at 17,[16] once places him "beyond the edge of the hedges." *Id.* at 18.

---

[16]     *See also id.* at 20 ("at the very precipice"); *id.* at 22 ("right at the edge").

Again, however, everyone is using different terminology to describe the same photos (*see* Cabrera's Brief at 18; Fitial's Brief at 16 (both citing ER-76-77)), which show Mr. Yarofalchuw precisely where he says he was – "between the bushes at the entrance to [his] driveway." ER-73 ¶ 4.

## II. THE SEIZURE BY SHOW OF AUTHORITY

### A. Mr. Yarofalchuw Was Seized by Show of Authority While He Was in the Curtilage of His Home.

A person may be seized by "physical force" or he may be seized by "show of authority." Terry v. Ohio, 392 U.S. 1, 19 fn. 16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). Mr. Yarofalchuw had the misfortune to be seized both ways within the span of a few minutes. The first seizure was by "show of authority," and occurred:

> when Sgt. Cabrera, despite being instructed by Mr. Yarofalchuw to leave the premises, did not do so, and instead positioned himself at the head of the driveway while he called for backup, prevented ingress and egress, and attempted, in his own words, to "de-escalat[e] the incident."

Appellant's Opening Brief at 16. These actions constituted police conduct of the type constituting a seizure, because they communicated to Mr. Yarofalchuw, and would have communicated to any reasonable person, that he was not free to terminate his encounter with the police.

> A consensual encounter with a police officer ripens into a seizure when, under all the circumstances surrounding the encounter, the

7

police conduct would have communicated to a reasonable person that the person was not free to . . . terminate the encounter.

United States v. Brown, 996 F.3d 998, 1005 (9th Cir. 2021) (internal quotation marks omitted) (*quoting* Florida v. Bostick, 501 U.S. 429, 439 (1991)). *See also* Hopkins v. Bonvicino, 573 F.3d 752, 773 (9th Cir. 2009) (same).

Sgt. Cabrera does not address, or even acknowledge, Mr. Yarofalchuw's actual argument,[17] and he entirely disregards the governing law at to *when*, *how* and *where* a seizure occurs. The *when* and the *how* has been described by this Court in the passage from Brown quoted above. As for the *where*, the place of seizure depends on the location of the person seized, rather than that of the officers seizing him. *See, e.g.*, United States v. Raymond Johnson, 626 F.2d 753, 757 (9th Cir. 1980) ("It is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home."); United States v. Al-Azzawy, 784 F.2d

---

[17] Cabrera instead attacks straw men. He asserts, for example, that "the mere presence of a police officer outside of the curtilage" does not constitute a seizure. Cabrera's Brief at 5. Of course, it doesn't; if all Sgt. Cabrera had done was merely to be present outside Mr. Yarofalchuw's curtilage – if, for example, he had happened to stroll down the road on his way fishing, or even stroll by in uniform on his neighborhood beat – Mr. Yarofalchuw would have had no objection.

Similarly, Cabrera continues, cautious retreat "is not a show of force constituting a Fourth Amendment seizure." *Id*. Again, he will get no argument. Mr. Yarofalchuw asked for no more than a cautious retreat. If Sgt. Cabrera had kept on cautiously retreating, this case would not now be before the Court. Instead, he retreated only far enough to continue to maintain control and authority over the scene, and to let everyone present know that he had it.

890, 892 (9th Cir. 1985) (same). Since all acts comprising the show of authority were taken while Mr. Yarofalchuw was well within the curtilage, and since the arrestee's location determines the site of arrest, he was arrested in the curtilage – *i.e.*, in the home.

## B. Cabrera Was an Integral Participant in the Seizure by Show of Authority.

All the actions constituting the show of authority are attributable to Sgt. Cabrera and render him liable for the unlawful seizure. That includes his own acts described above, and also Officer Fitial's arrival, because Cabrera had called Fitial to come back to help him arrest Mr. Yarofalchuw.[18] Fitial's arrival, completing the blockade of the driveway, was thus part of Cabrera's "show of authority." *See, e.g.*, Peck v. Montoya, 51 F.4th 877, 891 (9th Cir. 2022) (defendant liable who "set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury").

Cabrera himself does not dispute that he seized Mr. Yarofalchuw, *see* Cabrera's Brief at 18 ("Sgt. Cabrera conducted a warrantless arrest[.]"), but he never specifies what conduct on his part he thinks constituted the seizure. He evidently believes, however, that it was something he did *after* Mr. Yarofalchuw had arrived at the head of the driveway with his cell phone – probably the handcuffing. *See* ER-

---

[18]     *See* ER-149 (Fitial to Yarofalchuw: "[H]e called me to come back and arrest you[.]").

181 ("Officer Fitial and I grabbed both of his hands and…we were able to secure him in cuffs[.]").  He thus ignores his earlier "show of authority" altogether, since all the evidence is that, when the actions described above as constituting the "show of authority" occurred, Mr. Yarofalchuw had not yet arrived at the head of the driveway.[19]  When Sgt. Cabrera parked his car there, for example, Mr. Yarofalchuw was either still back at the pavilion or else already inside his house.[20]  And when Officer Fitial returned, Mr. Yarofalchuw was either still in the house or walking up the driveway from the house, not yet even as far as his guests' car in the yard, much

---

[19]    Cabrera goes to great pains to describe the head of the driveway as a "public space," *see* Cabrera's Brief at 18, and then he concludes: "Therefore, Mr. Yarofalchuw was in a public space where Sgt. Cabrera conducted a warrantless arrest[.]"  Cabrera's Brief at 18.

[20]    In all three guests' accounts, Sgt. Cabrera departed the pavilion for the head of the driveway, and Mr. Yarofalchuw departed in the other direction, for the house, more or less simultaneously. *See* ER-124 ¶ 10 (Carlos: "Sgt. Cabrera backed his car out of the driveway...as Nick went into his house"); ER-144 ¶ 4 (Sherwin: "Then Nick went into his house, and the policeman moved his car to the entrance of the driveway[.]"); ER-146 ¶ 4 (David: "Then the policeman moved his car to the entrance of the driveway, while Nick went to his house.").

Mr. Yarofalchuw himself states that he went from the pavilion to the house in response to, thus necessarily subsequently to, Sgt. Cabrera parking his car at the head of the driveway. *See* ER-149 ¶ 4 ("He moved his car to the entrance of my driveway, and parked it there.  When I saw this, I thought it was wrong, so I went and got my cell phone to take a video.").

On the other hand, Sgt. Cabrera at least implies that he parked the car after Mr. Yarofalchuw went into the house.  *See* ER-90 ¶¶ 30-33 ("Mr. Yarofalchuw... stood up and rushed into the door[.]...I quickly backed out to the roadway[.]...While I was backing up, I kept my eyes on the front door.").

less the head of the driveway.[21]  All of his locations during the show of authority –
the pavilion, the house, and the yard – were within the curtilage.

### C.  Fitial Was an Integral Participant in the Seizure by Show of Authority

Officer Fitial does discuss, but rejects, the possibility that he is liable for the
"show of authority" seizure.  *See* Fitial's Brief at 19-23.  He argues that his
participation was not integral to that seizure because he "had no reason to know that
[his] action – providing backup – could have potentially enabled a constitutional
violation."  *Id*. at 21.  On the contrary, he had plenty of reason to know that.  He
knew that Mr. Yarofalchuw was trying to terminate the encounter by ordering Sgt.
Cabrera to depart, because he heard that on the radio.[22]  He knew that Sgt. Cabrera

---

[21]     Both Carlos and Sgt. Cabrera appear to place Mr. Yarofalchuw still in the
house when Officer Fitial arrives.  *See* ER-124 (Carlos: "The second police car
arrived, and he blocked the driveway.  Nick came out of his house[.]"); ER-91 ¶ 48
(Cabrera: "Officer Fitial returned to the residence, and he parked behind my
vehicle[.] Mr. Yarofalchuw came back outside...[.]").

The clearest depiction of the parties' relative positions comes from David and
Sherwin, who relate that Sgt. Cabrera spoke to them at their car, while, "[a]t the
same time, Nick was coming out of the house carrying a cell phone."  ER-145 ¶ 4
(Sherwin); ER-146-47 ¶ 4 (David). "He was walking forward, but he was still behind
where our car was.  Just then the second police car came back and parked behind the
first[.]"  *Id.*  Even Officer Fitial described Mr. Yarofalchuw as still "approaching"
Sgt. Cabrera's position when he arrived, meaning he could not yet have reached that
point. *See* ER-85 ¶14.

[22]     *See* ER-85 ("I heard on my radio a male individual . . . yelling profanities at
Sergeant Cabrera.").  The only "profanity" appearing anywhere in the record was
"Get the f*** off my property," which was, and in context could only have been,
uttered by the homeowner, Mr. Yarofalchuw.

had no intention of departing, because Cabrera had called him for backup to arrest Mr. Yarofalchuw.[23]  And he could see as soon as he arrived back at the house that Sgt. Cabrera had not in fact departed, and was instead still trying to "de-escalate the situation;" and that Mr. Yarofalchuw was still at home and still objecting to Sgt. Cabrera's presence.[24]    Knowing all that, and knowing the law, as he is presumed to,[25] he could and should have said something along the lines of:

> John, let's just get out of here.  We're not de-escalating the situation; we *are* the situation, and we're escalating it just by being here.

> If you really want to bring this guy in for a misdemeanor, let's go get a warrant; but right now, he's at home, and he just wants us to leave.

> Let's let him terminate the encounter and go about his business.

Officer Fitial, in other words – having sufficient presence of mind, by his own account, to remember his training about an officer's "safety zone" (*see* ER-85 ¶ 16) – could and should have remembered the Constitution as well.  Instead, he joined in and began trying to "de-escalate the situation" (*i.e.*, restrict Yarofalchuw's liberty) himself.  *See*, *e.g.,* ER-85 ¶ 17 ("I told Yarofalchuw to calm down and he backed

---

[23]    *See* ER-149 (Fitial to Yarofalchuw: "[H]e called me to come back and arrest you[.]").

[24]    *See generally* ER-85; ER-91; ER-149.

[25]    *See, e.g.*, <u>Ward v. San Diego County</u>, 791 F.2d 1329, 1332 (9th Cir. 1986) ("Law enforcement officials must be cognizant not only of how far their authority extends, but also of the point at which their authority ends.").

up[.]"). He thus "acquiesced in the constitutionally defective conduct as part of a common plan" with Sgt. Cabrera, even though Cabrera's "conduct constituted the [initial] violation." <u>Peck</u>, *supra*, 51 F.4th at 891.

### D. A Show of Authority is an Objective Fact, the Existence of Which Is Not Affected by the Parties' Knowledge or Intent.

The district court, in its belated opinion, takes the view that there never was a "show of authority" seizure, because Mr. Yarofalchuw was unaware of what Sgt. Cabrera had told the guests regarding his plan to arrest Mr. Yarofalchuw. *See* SER-16 ("[T]his comment was communicated to the three individuals, *not* to Yarofalchuw. As far as Yarofalchuw was concerned, he had no idea that Sgt. Cabrera had any intent to arrest him.") (emphasis in original). The court similarly rejected any argument that Sgt. Cabrera's act of parking at the head of the driveway might reflect his intent or plan, on the ground that his "state of mind cannot readily be ascertained by the evidence submitted." SER-14 fn. 6.

However, "the test is not what [Yarofalchuw] felt but what a reasonable [person in his situation] would have understood." <u>Brendlin v. California</u>, 551 U.S. 249, 258 fn.4 (2007). Whether it is met is determined by objective facts, and not only must those facts be taken in the light most favorable to Mr. Yarofalchuw, he "also must be afforded the benefit of all reasonable inferences." <u>Easley v. City of Riverside</u>, 765 Fed. App. 282, 284 (9th Cir. 2019) (en banc). It can reasonably be inferred that an officer intent on gathering evidence and "de-escalating the situation"

comported himself with the demeanor of brisk authority that this purpose calls for, and that his actions and manners were those of one carrying out such a plan.[26] And, assuming Mr. Yarofalchuw to be a reasonable man, we must assume that he made reasonable inferences himself from the events as they occurred. A reasonable man, having just emphatically told Sgt. Cabrera to depart, then seeing Cabrera instead park his car at the head of the driveway, get out and start walking around directing events, would conclude at least that Cabrera was refusing to depart, and was instead determined to continue the encounter on his own terms. Seeing his guests in their car as if to leave, with Sgt. Cabrera talking to them, after which they remained in place, a reasonable man would conclude that they did so because Cabrera had told them to.[27] When he saw Officer Fitial, who had previously departed, come back and

---

[26] The Supreme Court has recognized that, "at the scene of a crime, arrest, or investigation," there exists "a societal expectation of unquestioned police command at odds with any notion that a [person] would feel free to leave, or to terminate the personal encounter any other way, without advance permission." Brendlin, supra, 551 U.S. at 258 (internal punctuation omitted). It can reasonably be inferred, in the absence of countervailing evidence, that this expectation prevailed.

The district court states, in conclusory fashion, that "Sgt. Cabrera's actual conduct was not authoritative[,]" SER-17, but there was no evidence in support of this conclusion. Cabrera could, no doubt, have been *more* authoritative – if, for example, he had "brandished his weapon or flaunted it in a threatening manner" (SER-25) – but an arrest can be effectuated long before that point is reached. His conduct was as authoritative as it needed to be.

[27] The guests themselves were seized under the rule of Brendlin: "It is... reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety....[T]he risk of harm to both the police and the occupants is minimized if

park behind Sgt. Cabrera, blocking the driveway, a reasonable man would conclude that he did so because Sgt. Cabrera had called him back. Seeing the reaction inspired by his attempt to terminate the encounter, anyone in Mr. Yarofalchuw's shoes would reasonably conclude he was not free to do so; thus, he was seized.

### E.  Mr. Yarofalchuw's Mobility Within the Curtilage Does Not Negate the Show of Authority.

The district court, in its belated opinion, relied on Mr. Yarofalchuw's ability to move around on his property as evidence that he was not seized.  For example, it wrote:

> [T]here was not an unlawful seizure because neither Sgt. Cabrera nor Fitial displayed a show of authority such that Yarofalchuw's movements were restrained within the home or curtilage.

SER-13.[28]  The ability to move around "within the house or curtilage," however, does not negate the reasonable impression that one is not free to terminate an encounter with police there, and it thus does not negate a seizure.  In his Opening Brief, Mr. Yarofalchuw cited Brizuela v.  City of Sparks, 2022 WL 3229389 (D.

---

the officers routinely exercise unquestioned command of the situation." Brendlin, *supra*, 551 U.S. at 258 (internal quotation marks omitted).

[28]  Officer Fitial also makes this point in his Brief.  *See e.g.*, Fitial's Brief at 13 ("Moreover, Yarofalchuw felt free to move about his residence, which was demonstrated when Yarofalchuw walked away from Officer Fitial and Sergeant Cabrera and returned to where they were standing[.]"); *id*. at 27 ("Yarofalchuw was able to move freely as evidenced by him going into the house and coming back out.").

Nev. 2022) (Brizuela I), in support of this proposition. *See* Opening Brief at 17-18. In Brizuela, the suspect had been standing on an outdoor patio, and the defendant officers had argued that he was not seized, on the ground that, "because there was a sliding glass door on the patio, [he] could have gone inside his home at any time[.]" *Id.* at *20. The district court concluded, however, that, when officers "blocked Mr. Brizuela's exit from his home," even "after he told them to leave," he was "seized as a matter of law." *Id.* "Whether Mr. Brizuela could have withdrawn into the interior of his home" was held to be "of no consequence." *Id.* The finding of an unlawful seizure in Brizuela has since been affirmed by this Court. *See* Brizuela v. City of Sparks, 2023 WL 5348815 at *1 (9th Cir. 2023) (Brizuela II) ("The district court did not err in granting Plaintiffs' motion for summary judgment and denying the Defendant Officers qualified immunity on Plaintiffs' Fourth Amendment search and seizure claims.").

The district court in *this* case, however, appeared to equate Mr. Yarofalchuw's ability to "move around" with a lack of "submissiveness" on his part – a quality that it appeared to believe was essential to a seizure. It wrote:

> Yarofalchuw was free to move about and even felt free to approach Sgt. Cabrera himself. This strongly indicates that Yarofalchuw did not feel threatened or subservient.

SER-16; and, similarly:

> Yarofalchuw's behavior (moving freely within his home and curtilage, confronting Sgt. Cabrera, recording the situation) suggests that he did not feel threatened by or submissive to the officers.

SER-24. The court's emphasis on how Mr. Yarofalchuw "felt" evinces the same erroneous subjectivity discussed in the preceding Section. Furthermore, there is no requirement that, in order to be seized by show of authority, one must feel, or even be, "subservient" or "submissive" to police officers. One need only "submit," *see* Brendlin, *supra*, 551 U.S. at 254 ("[T]here is no seizure without actual submission[.]"), and that can mean different things in different situations:

> [W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.

*Id.* at 262. Mr. Yarofalchuw was at home; he had no intention to depart.

> [W]hen a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter[.]

*Id.* at 255 (internal quotation marks omitted). Under these circumstances,

> a seizure…occurs when a law enforcement officer…restricts the liberty of a person. A person's liberty is restrained when… the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.

Hopkins, *supra*, 573 F.3d at 773 (citations and internal quotation marks omitted).

A similar case recently arose in the Sixth Circuit. *See* Campbell v. Cheatham County Sheriff's Dept., 47 F.4th 468 (6th Cir. 2022). In that case, defendant Officer

Fox argued that plaintiff Mark Campbell "came out to his front porch, yelled profanities, and went out to his yard[,]" and thus could not have been "seized." *Id*. at 477. The court, however, held that Mark's "limited range of movement is factually distinguishable from the cases in which a suspect is fleeing by running or driving away from officers." *Id*. at 477. It found that, despite "Mark's limited range of movement onto the curtilage of his home," he was "confined to [his] home because of Fox's show of authority[,]" and thus was seized. *Id*. Mr. Yarofalchuw was, if anything, even more limited in his range of movement. He was not trying to "get away" from the seizure in any way beside (correctly) arguing its unlawfulness. He certainly was not trying to see if he could "get a jump" on the officers, and, rather than walking "right on past" them, he walked directly to them. *See* Campbell, *supra*, 47 F.4th at 485 (Nalbandian, J., dissenting) (Mark "exited the rear of his house to see who was shooting at him and maybe get a jump on them [and] walked right on past [the] two officers"). *Cf*. ER-149 ("I approached the first policeman asking for his badge number[.]"). Mr. Yarofalchuw, however much he protested, "submitted" by remaining at home.[29]

---

[29] Some argue that Fourth Amendment jurisprudence too often protects only the "rugged individual" who stands up for his rights. *See* Sundby, The Rugged Individual's Guide to the Fourth Amendment, 65 UCLA L. REV. 690 (2018). Sundby cited the example of the appellant in Mapp v. Ohio, 367 U.S. 643 (1961), who "exhibited a certain constitutional *joi de vivre* in standing up for and asserting her rights…defiantly st[anding] at her home's threshold…and refus[ing police] entrance without a warrant." Sundby, *supra*, at 693. *See also id*. ("[S]he may have

### III. THE SEIZURE BY PHYSICAL FORCE

### A. Mr. Yarofalchuw Was Seized by Physical Force While Both He and Fitial Were in the Curtilage of His Home.

Mr. Yarofalchuw was also seized by use of force. This occurred when Officer Fitial handcuffed him.[30] Appellees do not deny that the handcuffing constituted a seizure. They argue only that it occurred outside in the curtilage. They concede, however, that "the bushes...would be the line that marks the end of the curtilage," ER-141,[31] and Mr. Yarofalchuw's photo recreation of the scene shows that he was not outside the bushes. He was in the driveway *between* the bushes, behind their outer edge. *See* ER-78-79. *See also* ER-73 ("When I was physically restrained by Officer Fitial, I was standing between the bushes at the entrance to my driveway."). He was in the approximate position of the letter Y in the following diagram, where

---

been 'belligerent,' but she was doing so in the name of the Bill of Rights."). Yet the district court would deny the amendment's protections to Mr. Yarofalchuw precisely *because* he "belligerently" stood up for his rights in this way.

[30] Cabrera apparently promptly came in to assist, as both officers report that both participated. *See* ER-181 (Cabrera: "Officer Fitial and I grabbed both of his hands and...we were able to secure him in cuffs."); ER-182 (Fitial: "Sgt. CABRERA and I were trying to place him in handcuffs which we managed[.]").

[31] *Cf.* Madruga v. County of Riverside, 431 F.Supp.2d 1049, 1055 (C.D. Cal. 2005) ("Usually [the curtilage] is enclosed some way by fence or shrubs.").

According to Cabrera, "[t]he parties in this case stipulated that the hedges... *and telephone pole* represented the defining line for...the curtilage." Cabrera's Brief at 18 (emphasis added). Mr. Yarofalchuw never stipulated to anything about the telephone pole.

H shows the hedge, and the line along the bottom marks the outer boundary of the curtilage: <u>HHHH</u>   Y   <u>HHHH</u>.  He was thus in the doorway of the curtilage – what the district court accurately described as "akin to what has been known as the doorway of a person's home."  ER-21.  Indeed, since the curtilage is "part of the home itself for Fourth Amendment purpose," <u>Florida v. Jardines</u>, 569 U.S. 1, 6 (2013) (*quoting* <u>Oliver v. United States</u>, 466 U.S. 170, 180 (1984)), he *was* in the doorway of his home.

The boundary of the curtilage (*i.e.*, of the home) runs along the outside of the hedge, rather than the inside – *i.e.*, along the bottom rather than the top of the row of H's – and it continues in a straight line across the gap where the driveway passes through the hedge.  This is clear from <u>Payton v. New York</u>, 445 U.S. 573 (1980), in which the Supreme Court held that "the Fourth Amendment has drawn a firm line at the entrance to the house[,]" *id*. at 590, and <u>Kyllo v. United States</u>, 533 U.S. 27 (2001), where it concluded that the <u>Payton</u> line "must be not only firm but also bright[.]"  *Id*. at 40.  Applying these principles, the <u>Kyllo</u> Court held that, when Fourth Amendment requirements are not met, "*any* physical invasion of the structure of the home, *by even a fraction of an inch*, is too much."  *Id*. at 37 (emphasis added, internal punctuation omitted).  *See also, e.g.*, <u>Wiederspohn v. Freeman</u>, 2009 WL 10723396 at *4 (W.D.Wash. 2009) ("[A]ny physical invasion of the home by law

20

enforcement, without a warrant, 'by even a fraction of an inch,' violates the Fourth Amendment.").

An invasion of a structure by a fraction of an inch can only be measured from its outer surface, thus must include a quarter-inch progress past that surface into the doorway. For example, in a wall made of eight-inch cinderblocks, the doorframe would extend eight inches inward from the outer wall, such that any step into that eight-inch space would be a step into the home – similar to the "breaking the plane" rule in football.[32] This is "clearly established" enough that qualified immunity has been denied to officers who only placed a foot in the doorway. *See, e.g.*, Parish v. Lansdale, 2019 WL 4849612 at *7 (D. Ariz. 2019) (finding it clearly established that "a foot on the threshold is an entry into the structure") (*citing*, *inter alia*, Payton and Kyllo).[33] Where the wall of the home is a hedge, and the entranceway to the home is a break in the hedge, then, by the same principles, a step between the bushes –

---

[32]     *See* WIKIPEDIA, "Touchdown," https://en.wikipedia.org/wiki/Touchdown ("In all gridiron codes, the touchdown is scored the instant the ball touches or 'breaks' the plane of the front of the goal line[.]...The slightest part of the ball touching or being directly over the goal line is sufficient for a touchdown to score.").

[33]     The Parish court cited numerous foot-in-the-door cases in which qualified immunity had been denied. *See id*. at *8 (*citing*, *inter alia*, Dalcour v. City of Lakewood, 492 Fed. App. 924, 932-33 (10th Cir. 2012) ("Physical entry of a home, *even if only with one foot on the threshold*, is an entry of the home for constitutional purposes."); Hanie v. City of Woodstock, 2008 WL 476123 at *7 (N.D. Ga. 2008) (officer investigating noise complaint "was on fair notice that she could not place her foot *even a fraction of an inch* into the structure of the [plaintiffs'] home.") (emphases added).

which Fitial clearly took (*see* ER-79) – is a step into the doorway, which is a step into the home.

These principles apply to the curtilage because it is "part of the home itself." Jardines, *supra*, 569 U.S. at 6. For example, in Brizuela II, *supra*, 2023 WL 5348815, this Court recently applied the Payton "firm line at the entrance" rule to the curtilage when finding it "clearly established" that a warrantless front-porch arrest was improper, writing:

> Supreme Court precedent clearly establishes that, when law enforcement encroaches on the curtilage of a suspect's home without a warrant, it violates the Fourth Amendment's prohibition against unreasonable searches [*citing* Jardines]. It is likewise clearly established that...the Fourth Amendment has drawn a firm line at the entrance to the house [*citing* Payton]. The Officers detained Brizuela on the curtilage of his home without a warrant...[T]he district court did not err by denying qualified immunity to the Officers[.]

*Id*. at *2 (citations and internal quotation marks omitted) (*citing* Jardines and Payton). *See also, e.g.*, Lawson v. Gregg, 2014 WL 12519805 at *3 & fn. 40 (D. Alaska 2014) (denying qualified immunity in warrantless back porch arrest case, finding it "clearly established that curtilage is considered part of the home") (*citing* Oliver); Brizuela I, *supra*, 2022 WL 3229389 at *21, *aff'd on this point* Brizuela II, 2023 WL 5348815, *supra* (denying qualified immunity in warrantless front porch arrest case, finding "[t]here is clearly established Supreme Court precedent holding ...that curtilage is treated as part of the home for Fourth Amendment purposes").

Jardines in particular is clear that this means the "home" as used in Kyllo. *See* Jardines, 569 U.S. 1 at 11 (noting that principles of Kyllo extend to the curtilage).[34]

It may be objected that none of these cases specifically involved an entrance to the curtilage through a gap in a hedge. However, "we cannot find qualified immunity wherever we have a new fact pattern." Dalcour, *supra*, 492 Fed. App. at 933 (internal brackets omitted). Curtilage issues in particular, being based on concepts "easily understood from our daily experience," Oliver, *supra*, 466 U.S. at 182 fn. 12, have expressly been found well suited to resolution by officers' own common sense. In Collins v. Virginia, 138 S. Ct. 1663 (2018), the Court rejected the argument that "[r]equiring officers to make case-by-case curtilage determinations...unnecessarily complicates matters[,]" *id*. at 1674, noting that:

> officers regularly assess whether an area is curtilage before executing a search. [There is] no reason to conclude that this practice has proved to be unadministrable, either generally or in this context. Moreover, creating a carveout to the general rule that curtilage receives Fourth Amendment protection, such that certain types of curtilage would receive Fourth Amendment protection only for some purposes but not for others, seems far more likely to create confusion than does uniform application of the Court's doctrine.

---

[34] Similarly, it has been held that, where there is no fence, "the outer walls of the extreme outbuildings of the curtilage define the outer limits of the curtilage." United States v. Williams, 581 F.2d 451, 454 (5th Cir. 1978). *See also* United States v. Berrong, 712 F.2d 1370, 1374 (11th Cir. 1983) (same). *See also, e.g.*, United States v. Charles, 290 F.Supp.2d 610, 614 (D.V.I. 1999), *aff'd* 29 Fed. App. 892 (3rd Cir. 2002) ("Clearly, the doorknob on the defendant's front door . . . is within the curtilage of the home."); Key v. State, 348 So.3d 691, 695 (Fla. App. 2022) ("Just as the building's walls are part of the structure, the curtilage's fence is also part of the structure.").

*Id.* at 1674-75 (citations and internal quotation marks omitted). Appellees were perfectly capable of "uniform application" of <u>Payton</u> and <u>Kyllo</u> to both walls and hedges.

### B. <u>Santana</u> Does Not Justify a Seizure By an Officer Who Has Crossed the Threshold.

Both Appellants, and the district court, rely on <u>United States v. Santana</u>, 427 U.S. 38 (1976), and cases following <u>Santana</u>, for the proposition that a warrantless arrest of one standing exposed to public view in the doorway of his home is *per se* constitutional.[35]  <u>Santana</u>, rightly read, does not support that proposition; and no reasonable reading of <u>Santana</u> goes far enough to justify the arrest in this case.

In <u>Santana</u>, police seeking a suspect first saw her standing in the open doorway of her home.  When they announced their presence, she retreated into the home; they followed and arrested her inside.  The Court upheld the warrantless home arrest on the ground of "hot pursuit."  *See id*. at 42-43.  Along the way, it also opined that it *would have* been proper for the police to have arrested Santana as she stood in the doorway, "when [they] first sought to" do so.  *Id*. at 42.  That part of <u>Santana</u> was

---

[35]  *See* District Court Opinion at SER-17 (citing <u>Santana</u>); Fitial's Brief at 17-18 (citing <u>Santana</u>, <u>United States v. Botero</u>, 589 F.2d 430 (9th Cir. 1978), and <u>Commonwealth v. Bowie</u>, 3 N.M.I. 462 (1993)); Cabrera's Brief at 21, 23-24 (*citing* <u>Santana</u>, <u>Botero</u>, <u>Bowie</u>, and <u>United States v. Vaneaton</u>, 49 F.3d 1423 (9th Cir. 1995)).

dicta, however, since no arrest actually occurred in the doorway.[36]  The actual arrest of Santana was made was inside her home, and was justified by hot pursuit.  This Court recognized as much in LaLonde v. County of Riverside, 204 F.3d 947 (9th Cir. 2000), writing: "[T]he decision in Santana turned on exigent circumstances...[I]t was a 'hot pursuit' case."  *Id*. at 955.

Santana's dictum also relied on a concept of the Fourth Amendment based wholly in the concept of the "reasonable expectation of privacy" articulated in Katz v. United States, 389 U.S. 347 (1967); it expressly gave no weight to common law concepts such as curtilage.  The Santana Court wrote:

> While it may be true that under the common law of property the
> threshold of one's dwelling is "private," as is the yard surrounding the
> house, it is nonetheless clear that under the cases interpreting the Fourth
> Amendment Santana was in a "public" place.  She was not in an area
> where she had any expectation of privacy.  "What a person knowingly
> exposes to the public, even in his own house or office, is not a subject

---

[36]     "[L]egal conclusions about hypothetical facts are dicta[.]" United States v. Files, 63 F.4th 920, 929 (11th Cir. 2023) (*citing* Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010)).  "[A]lthough dictum may be followed if sufficiently persuasive, it ought not to control the judgment in a subsequent suit[.]" United States v. Montero-Camargo, 208 F.3d 1122, 1132 fn. 17 (9th Cir. 2000) (*quoting* Humphrey's Executor v. U.S., 295 U.S. 602, 627 (1935)) (internal quotation marks omitted).

It was not even "well-reasoned dicta," *cf*. Enying Li v. Holder, 738 F.3d 1160, 1165 fn. 2 (9th Cir. 2013) ("Well-reasoned dicta is the law of the circuit."), because it did not address or consider the ramifications of any of the variable facts that would inevitably have occurred had Santana stayed put and the police actually arrested her in the doorway – *e.g.*, if she had been arrested by verbal command or by physical grasp; by police stepping into the doorway themselves or standing outside; etc. .

> of Fourth Amendment protection." <u>Katz v. United States</u>, 389 U.S.
> 347, 351 (1967).

<u>Santana</u>, *supra*, 427 U.S. at 42 (parallel citations omitted). The Court did not expressly use the word "curtilage," but that is plainly what it was referring to when it described the "common law of property" by which the threshold and the yard are considered "private" places. According to <u>Santana</u>, the <u>Katz</u> rule has superseded and replaced this common-law property rule for purposes of defining the extent of Fourth Amendment protections. The Court held precisely the opposite in <u>Jardines</u>, however, when it wrote that "the <u>Katz</u> reasonable-expectations test 'has been *added to*, not *substituted for*' the traditional property-based understanding of the Fourth Amendment." <u>Jardines</u>, *supra*, 569 U.S. at 10-11 (emphasis by court). The <u>Santana</u> dictum cannot be reconciled with the holding of <u>Jardines</u>; they are diametrically opposed. It may be objected that <u>Jardines</u> did not overrule <u>Santana</u>, but it did not need to, because the actual holding of <u>Santana</u> – *i.e.*, the application of the "hot pursuit" rule – remains valid. The dictum addressed to a hypothetical situation in <u>Santana</u> was wrong, but it was only dictum in the first place.

It may also be objected that this analysis, however correct, is too much abstruse legal doctrine to be "clearly established" in the reasonable understanding of the average cop on the beat. Even if so, however, that objection applies only to the situation where the officer does not cross the threshold of the entrance himself to make the arrest. <u>LaLonde</u>, *supra*, 204 F.3d 947, clarifies that <u>Santana</u> does not apply

if he does so, and <u>LaLonde</u> been held to preclude qualified immunity for officers doing so to rely on any "doorway exception:"

> If the arrest takes place only after the officers have crossed the threshold of the door and entered the home, the Ninth Circuit clearly established that such a case does not fall under the doorway exception. Thus, <u>LaLonde</u> put the constitutional question confronting the Officers in [this] case beyond debate.

<u>Malek v. Green</u>, 2018 WL 2431437 at *13 (N.D. Cal. 2018) (citations and internal quotation marks omitted). The other <u>Santana</u> progeny relied on by Appellants also present situations where police did not cross the threshold. *See, e.g.*, <u>Vaneaton</u>, *supra*, 49 F.3d at 1427 ("The police did not enter the house until they formally placed Vaneaton under arrest.");[37] <u>Botero</u>, *supra*, 589 F.2d at 432 ("The arresting officers were not required to enter the apartment in order to place Botero under arrest."); <u>Bowie</u>, *supra*, 3 N.M.I. at 469 ("The officers did not enter the house in order to arrest the defendant."). *See also, e.g.*, <u>Quintero v. City of Escondido</u>, 2017 WL 4005345 at *5 (S.D. Cal. 2017) (distinguishing <u>Santana</u> and <u>Vaneaton</u> on this ground).

---

[37] <u>Vaneaton</u> was distinguished in <u>Glazer v. City of Long Beach</u>, 210 F. Supp. 2d 1131 (C.D. Cal. 2000), on the ground that "in <u>Vaneaton</u> the police specifically advised the suspect that he was under arrest before they crossed the threshold of the doorway," whereas the plaintiff in <u>Glazer</u> contended that the police "never advised him that he was under arrest prior to entering [the] home." *Id*. at 1136. This case is distinguishable for the same reason. Not only did Officer Fitial never advise Mr. Yarofalchuw that he was under arrest prior to crossing the threshold, he claimed even after crossing it that "it was not an arrest." ER-86 ¶ 18.

## IV. THERE WERE NO EXIGENT CIRCUMSTANCES

"[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  LaLonde, *supra*, 204 F.3d at 956-57 (*quoting* Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)).  Cabrera and Fitial never attempt to lift this burden.  As noted in at Section I(A), *supra*, they strive to create the impression of an exigent need to protect their own safety, by liberally salting their factual recitations with words like "belligerently" and "aggressively," but they never argue that such a need actually existed.  Nor could they, on the facts. "The need to protect or preserve life or avoid serious injury" – *i.e.* an "emergency threatening life or limb" – is a recognized exigent circumstance justifying warrantless arrest, Mincey v. Arizona, 437 U.S. 385, 392-93 (1978),[38] but neither Appellees, nor the district court, ever claims that any such emergency existed, or that either of them ever even believed, reasonably or otherwise, that it existed.  There was no evidence that anyone's "lives or limbs" were ever in danger, or ever believed

---

[38]     *See also, e.g.*, Hopkins, *supra*, 573 F.3d at 763 ("The 'emergency' exception . . . allows [police] them 'to respond to emergency situations' that threaten life or limb[.]"); Sidhu v. Garcia, 459 Fed. App. 613, 613-14 (9th Cir. 2011) ("The warrantless search was justified by the emergency exception to the Fourth Amendment [which] allows officers to respond to 'emergency situations that threaten life or limb' in a timely manner.") (*quoting* Hopkins); Good v. Dauphin County Social Services for Children & Youth, 891 F.2d 1087, 1094 (3rd Cir. 1989) ("[T]he state actors . . . must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat.").

to be in danger, from Mr. Yarofalchuw and his cell phone, however "belligerently" he may have been holding it while recording Appellants' misconduct.

## V. THE DENIAL OF THE MOTION FOR LEAVE TO AMEND WAS IN ERROR

As to this issue, Appellant rests on the arguments, points and authorities set out in his Opening Brief at 32-38.

## <u>CONCLUSION</u>

It is clearly established that a seizure occurs when "police conduct would have communicated to a reasonable person that the person was not free to...terminate the encounter[,]" <u>Hopkins</u>, *supra,* 573 F.3d at 773 (*quoting* <u>Bostick</u>, *supra*, 501 U.S. at 439), and that "[i]t is the location of the arrested person...that determines whether an arrest occurs within a home." <u>Raymond Johnson</u>, *supra*, 626 F.2d at 757. Mr. Yarofalchuw was therefore clearly seized by show of authority in the curtilage, which is "part of the home itself." <u>Jardines</u>, *supra*, 566 U.S. at 6. It is likewise clearly established that an intrusion into the home "even of a fraction of an inch" is an intrusion. <u>Kyllo</u>, *supra*, 533 U.S. at 37. He was therefore clearly seized by force, again in the home, and again with neither warrant nor exigent circumstances. For the foregoing reasons, his seizure was unconstitutional, and the judgment of the district court must be reversed.

//

//

29

Respectfully submitted this thirtieth day of October, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-15279

I am the attorney or self-represented party.

**This brief contains** 8,381 **words,** including 0 words manually counted in any visual images,

and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with

FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [x] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Joseph E. Horey*          **Date** October 30, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

31